AO 106 (Rev. 04/10) Application for a Search Warrant

US DISTRICT COURT
~~WESTERN DIST ARKANSAS~~

# UNITED STATES DISTRICT COURT

FILED

. for the

Western District of Arkansas
Fayetteville Division

SEP 1 1 2019

DOUGLAS F. YOUNG, Clerk

By _____ Deputy Clerk

In the Matter of the Search of )
Any and all structures and outbuildings to include )
vehicles located on the property or arriving )
on the property and curtilage of )
2100 Ashlee Drive, Apartment B )
Springdale, Arkansas 72764 )

Case No. ___FAY · 19cm 98___

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**Any and all structures and outbuildings to include vehicles located on the property and arriving on the property and curtilage of 2100 Ashlee Drive, Apartment B, Springdale, Arkansas 72764, more particularly described on "Attachment A".**

**This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*: **See "Attachment B"**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

■ evidence of a crime;

■ contraband, fruits of crime, or other items illegally possessed;

■ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of: **18 U.S.C. § 2252, et seq.**

The application is based on these facts: **See Affidavit of Task Force Officer Thomas Wooten- "Attachment C"**

■ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Thomas Wooten, Task Force Officer, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___9|11|19___

_____
*Judge's signature*

City and state: Fayetteville, Arkansas

Erin L. Wiedemann, Chief United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

Any and all structures and outbuildings to include vehicles and campers located on the property or arriving on the property and curtilage of 2100 Ashlee Dr., Apartment B, Springdale, Arkansas 72764 (the "**SUBJECT PREMISES**"). Ashlee Drive is located between Oriole Street and Thrush Street, which runs east to west. The **SUBJECT PREMISES** is more particularly described as a "duplex" style home; it is a single-story brick structure with yellow colored trim facia boards and siding. The numbers "2100" are displayed on the front of the residence and each side has the letter "A" or "B" displayed above the front door. The SUBJECT PREMISES is situated on the North side of the road, with the front door facing South.



## ATTACHMENT B
## ITEMS TO BE SEARCHED FOR AND SEIZED

a.    Images of child pornography, including any and all digital images stored on devices capable of such, and files containing images of child pornography in any form wherever it may be stored or found including, but not limited to:

    i.    any and all computer hardware and software capable of storing, accessing, sending or receiving digital information, computer system, computer tablet, smart phones, micro SD cards, and related peripherals, or any other device capable of accessing the internet and/or storing digital data; tapes, cassettes, cartridges, streaming tape, commercial software and hardware, internal or external storage devices, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to cellular telephones, hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Blue Ray players, Flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography, or information pertaining to an interest in child pornography;

    ii.    any and all applications (apps) contained on any electronic device including the eMule program, books and magazines, digital or otherwise, containing visual depictions of minors engaged in sexually explicit conduct or involving the physical description of sexual activity involving minors

    iii.    originals, copies, and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

    iv.    motion pictures, films, videos, film negatives, digital or print copies, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

b.    information or correspondence pertaining to the possession, receipt or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, that were transmitted or received using computer or any internet capable device, or any other

facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited to:

    i.     envelopes, letters, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

    ii.    books, records, and any other written or digital information bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

c.    Any and all credit card information including but not limited to bills and payment records for subscription to internet or non internet based companies allowing access to images of minors engaging in sexually explicit activities, or reflecting the purchase of or access to any material related to child pornography;

d.    Any and all correspondence pertaining to the possession, receipt or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256 whether transmitted or received using computer, a facility or means of interstate commerce, common carrier, or mail.

e.    Any and all computer-related documentation to include written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items. In addition to passwords, to include alphanumeric strings, pass-phrases, password files, and similar decryption codes necessary to access data that is encrypted or otherwise inaccessible.

f.    Any and all security devices, to include physical keys, encryption devices, "dongles", and similar physical items needed to gain access to associated computer hardware. In addition, peripherals, equipment that send data to, or receive data from, computer hardware, but do not normally store user data, such as keyboards, mice, printers, scanners, plotters, video display monitors, modems, cables, and certain types of facsimile machines.

g.       Any and all address books, names, and lists of names and addresses of minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

h.       Any and all diaries, notebooks, notes and any other electronic records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, and Section 2256.

k.       In searching the data, the computer personnel may copy all of the data contained in the computer equipment and storage devices. In doing so, the search is authorized to allow the computer personnel to recover and examine: all images contained upon any seized device wherever they may be found, a search of unallocated spaces for images related to child pornography, a search to identify Peer-to-Peer programs, a search of terms related to child pornography, and any other search and examination that would reveal the existence of child pornography on the seized item including deleted, hidden, accessing applications (apps), and/or encrypted data. Emails, data files, and any other electronic information related to the ownership of the seized electronic media may be copied, imaged and examined during purposes of conducting the forensic examination.

## ATTACHMENT C

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| **STATE OF ARKANSAS** | : |
| | : |
| | :  **ss. A F F I D A V I T** |
| | : |
| **COUNTY OF WASHINGTON** | |

## Affidavit in Support of Application for Search Warrant

I, Thomas Wooten, a Task Force Officer with Homeland Security Investigations (HSI), being duly sworn, hereby depose and state as follows:

1.  Since June 2000, I have been a police officer/detective with the Springdale, Arkansas Police Department. As such, I am authorized by the State of Arkansas to apply for and execute search warrants, arrest warrants and other instruments of the court. As a police officer/ detective, I have received specialized training in matters related to criminal investigation, specifically but not limited to the area of sexual exploitation of minors, drug distribution, and money laundering. Since August of 2017, I have been assigned as a Task Force Officer to Homeland Security Investigations (HSI), a component of the U.S. Department of Homeland Security.

2.  As a Task Force Officer (TFO) with HSI I primarily investigate crimes related to the sexual exploitation of minors. Prior to joining HSI, I attended a 40-hour training session covering Title 8, Title 18, Title 19 and Title 21 of the United States Code. As such, I am a law enforcement officer within the meaning of Section 115(c)(1) of Title 18 United States Code, who is authorized by law or Government agency to engage in or supervise the prevention, detection, investigation and/or prosecution of any violation of Federal and State criminal law.

3.    This Affidavit is being submitted in support of an application for a search warrant for the premises located at **2100 Ashlee Dr., Apartment B, Springdale, Arkansas 72764** (hereinafter referred to as the "**SUBJECT PREMISES**"). As such, it does not include all the information known to me as part of this investigation, but only information sufficient to establish probable cause for the requested search warrant.

## Statutory Authority

4.    This investigation concerns alleged violations of Title 18, United States Code, Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors, which has been defined in Title 18 U.S.C. 2256, as an individual under 18 years of age.

a.    Under 18 U.S.C. Section 2252(a)(1) (transportation), 2252(a)(2) (receipt and distribution), and 2252(a)(4)(B) and 2252A(a)(5)(B) (possession), it is a federal crime for any person to transport, distribute, receive, and possess child pornography, as that term is defined by federal law.

b.    Further under 18 U.S.C. Section 2253(a)(3), a person who is convicted of an offense under 18 U.S.C. Section 2252 or 2252A, shall forfeit to the United States such person's interest in any property, real or personal, used or intended to be used to commit or to promote the commission of such offense.

## Computers and Child Pornography

5.    Based upon my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that computers and computer technology have revolutionized the way in which child pornography is produced, distributed and utilized. Prior to the advent of computers and the Internet, child pornography was produced using

cameras and film, resulting in either still photographs or movies. The photographs required darkroom facilities and a significant amount of skill to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these images on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls, and compensation for these wares would follow the same paths. More recently, using computers and the Internet, distributors of child pornography use membership-base/subscription-based websites to conduct business, allowing them to remain relatively anonymous.

6. In addition, based upon my own knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that the development of computers has also revolutionized the way in which those who seek out child pornography are able to obtain this material. Computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage. More specifically, the development of computers has changed the methods used by those who seek to obtain access to child pornography in these ways.

7. Producers of child pornography can now produce both still and moving images directly from a common video or digital camera. The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer. Images can then be stored, manipulated, transferred, or printed directly from the computer. Images can be edited in ways similar to how a photograph may be altered. Images

can be lightened, darkened, cropped, or otherwise manipulated. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

8. The Internet allows any computer to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. A host computer is one that is attached to a network and serves many users. Host computers are sometimes operated by commercial Internet Service Providers (ISPs), such as America Online ("AOL") and Microsoft, which allow subscribers to dial a local number and connect to a network which is, in turn, connected to the host systems. Host computers, including ISPs, allow e-mail service between subscribers and sometimes between their own subscribers and those of other networks. In addition, these service providers act as a gateway for their subscribers to the Internet or the World Wide Web.

9. The Internet allows users, while still maintaining anonymity, to easily locate other individuals with similar interests in child pornography; and websites that offer images of child pornography. Those who seek to obtain images or videos of child pornography can use standard Internet connections, such as those provided by business, universities, and government agencies, to communicate with each other and to distribute child pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions involving those who wish to gain access to child pornography over the Internet. Sometimes the only way to identify both parties and verify the transportation

of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache to look for "footprints" of the websites and images accessed by the recipient.

10. The computer's capability to store images in digital form makes it an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as a "hard drive") used in home computers has grown tremendously with the last several years. Hard drives with the capacity of 160 gigabytes are not uncommon. These drives can store thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime." Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

11. A growing phenomenon on the Internet is Peer-To-Peer (P2P) file sharing. P2P file sharing programs are a standard way to transfer files from one computer system to another while connected to a network, usually the Internet. P2P file sharing programs allow groups of computers using the same file sharing network and protocols to connect directly to each other to share files. There are several P2P networks currently operating, one of these being the "eMule network" (hereinafter referred to as "eMule"). P2P file sharing networks, including the Gnutella and eMule networks, are frequently used to trade digital files of child pornography. These files include both image and movie files. P2P file sharing programs are a standard way to transfer files from one computer system to another while connected to a network, usually the Internet. Peer-to-Peer- P2P file sharing programs allow groups of computers using the same file sharing

network and protocols to connect directly to each other to share files. Many P2P file sharing networks are designed to allow users to download files and frequently provide enhanced capabilities to reward the sharing of files by providing reduced wait periods, higher user ratings, or other benefits. In some instances, users are not allowed to download files if they are not sharing files. Typically, settings within these programs control sharing thresholds.

12.     With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world. This connection can be made by any number of means, including modem, local area network, wireless and numerous other methods.

13.     To access the P2P networks, a user first obtains the P2P software, which can be downloaded from the Internet. This software is used exclusively for the purpose of sharing digital files. When the P2P software is installed on a computer, the user is directed to specify a "shared" folder. All files placed in that user's "shared" folder are available to anyone on the world-wide network for download. Most P2P software gives each user a rating based on the number of files he/she is contributing to the network. This rating affects the user's ability to download files. The more files a user is sharing, the greater his/her ability is to download files. This rating system is intended to encourage users to "share" their files, thus propagating the P2P network. However, a user is not required to share files to utilize the P2P network.

14.     A user obtains files by conducting keyword searches of the P2P network. When a user initially logs onto the P2P network, a list of the files that the user is sharing is transmitted to the network. The P2P software then matches files in these file lists to keyword search requests from other users. A user looking to download files simply conducts a keyword search. The results of the keyword search are displayed, and the user then selects file(s) that he/she wants to

download. The download of a file is achieved through a direct connection between the computer requesting the file and the computer(s) hosting the file. Once a file has been downloaded, it is stored in the area previously designated by the user and will remain there until moved or deleted. Most of the P2P software applications keep logs of each download event. Frequently, a computer forensic examiner, using these logs, can determine the Internet Protocol ("IP") address from which a particular file was obtained.

15.    Thus, a person interested in sharing child pornography with others in the P2P network, need only place those files in his/her "shared" folder(s). Those child pornography files are then available to all users of the P2P network for download regardless of their physical location. For instance, a person interested in obtaining child pornography can open the P2P application on his/her computer and conduct a keyword search for files using a term such as "preteen sex." The keyword search would return results of files being shared on the P2P network that match the term "preteen sex." The user can then select files from the search results and those files can be downloaded directly from the computer(s) sharing those files.

16.    One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel. This means that the user can download more than one file at a time. In addition, a user may download parts of one file from more than one source computer at a time. For example, a user downloading an image file may actually receive parts of the image from multiple computers. This reduces the time it takes to download the file. A P2P file transfer is assisted by reference to an Internet Protocol (IP) address. This address, expressed as four numbers separated by decimal points, is unique to a particular Internet connection during an online session. The IP address provides a unique location making it possible for data to be transferred between computers.

17. Even though the P2P network links together computers all over the world and users can download files, it is not possible for one user to send or upload a file to another user of the P2P network. The software is designed only to allow files to be downloaded that have been selected. One does not have the ability to send files from his/her computer to another user's computer without their permission or knowledge. Therefore, it is not possible for one user to send or upload child pornography files to another user's computer without his/her active participation.

18. Based on my training and experience, I also know the following about the operation of the eMule file-sharing network, one of several P2P networks, and the subject of this investigation:

- a. The eMule network is also known as the eDonkey2000 file-sharing network, or eD2k. Users of this network can simultaneously provide files to users while downloading files from other users.

- b. The eMule network can be accessed by computers running several different client programs. These programs share common protocols for network access and file sharing. The user interface features and configuration may vary between clients and versions of the same client.

- c. During the default installation of an eMule client, settings are established which configure the host computer to share files. Depending upon the eMule client used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed.

- d. Typically, a setting establishes the location of one or more directories or folders whose files are made available for distribution to other eMule users.

e. Typically, a setting controls whether or not other users of the network can obtain a list of the files being shared by the host computer.

f. Typically, a setting controls whether or not users will be able to share portions of a file while they are in the process of downloading the entire file. This feature increases the efficiency of the network by putting more copies of file segments on the network for distribution.

g. Files on the eMule network are uniquely identified using MD4 root hash of a MD4 hash list of the file. This treats files with identical content but different names as the same, and files with different contents but the same name as different.

h. Files located in a user's shared directory are processed by the client software. As part of this processing, a MD4 root hash value is computed for each file in the user's shared directory.

i. The eMule network uses MD4 root hash values to improve network efficiency. Users may receive a selected file from numerous sources by accepting segments of the file from multiple users and then reassembling the complete file on the local computer. The client program succeeds in reassembling the file from different sources only if all the segments came from exact copies of the same file. The network uses MD4 root hash values to ensure exact copies of the same file are used during this process.

j. The eMule software allows the user to search for pictures, movies and other files by entering descriptive text as search terms. These terms are typically processed

by peers based upon the information about the files that had been sent by individual users.

k. Entering search terms into an eMule client returns a list of files and descriptive information including, in some client software, the associated MD4 root hash values.

l. A person is able to compare the MD4 root hash values of files being shared on the network to previously identified MD4 root hash values of any file, including child pornography. Using a publicly available eMule client a user can select the MD4 root hash value of a known file and attempt to receive it. Once a specific file is identified, the download process can be initiated. Once initiated, a user is presented with a list of users or IP addresses that have recently been identified as download candidates for that file. This allows for the detection and investigation of computers involved in possessing, receiving and/or distributing files of previously identified child pornography.

m. Internet computers identify each other by an Internet Protocol or IP address. IP addresses can assist law enforcement in finding a particular computer on the Internet. IP addresses can typically lead the law enforcement officer to a particular Internet service company and that company can typically identify the account that used the IP address to access the Internet.

n. The IP addresses can be used to identify the location of these computers. A review of the MD4 root hash signatures allows an investigator to identify the files that are child pornography.

o. The MD4 (or Message-Digest Algorithm) is a cryptographic hash function developed by Ronald Rives in 1990. The digest length is 128 bits.

p. The returned list of IP addresses can include computers that are likely to be within this jurisdiction. The ability to identify the approximate location of these IP address is provided by IP geographic mapping services, which are publicly available and also used for marketing and fraud detection. At this point in the investigative process, a recent association between a known file (based upon MD4 root hash comparison) and a computer having a specific IP address (likely to be located within a specific region) can be established.

q. Once this association has been established, an investigator can attempt to download the file from the associated user or view the contents of the shared directory. Depending upon several factors including configuration and available resources, it might not be possible to do either.

r. Depending on the associated user configuration and available peer resources a listing of the files being shared may be displayed. In order to obtain this list of files, a direct connection between the computers must occur. This list can be a partial listing of the shared files. The file list can only be obtained if the associated peer is connected to the network and running an eMule client at that moment.

s. By receiving either a file list or portions of a download from a specific IP address the investigator can conclude that a computer, likely to be in this jurisdiction, is running an eMule client and possessing, receiving and/or distributing specific and known visual depictions of child pornography.

19. Additionally, your Affiant knows that P2P software may display the Globally Unique Identifier (GUID) identification number of computers offering to share files on the network. A Globally Unique Identifier or GUID is a pseudo-random number used in software applications. This GUID number is produced when some P2P software applications are installed on a computer. While each generated GUID is not guaranteed to be unique, the total number of unique keys is so large that the probability of the same number being generated twice is very small. When comparing these GUIDs, your Affiant can quickly determine with a high degree of certainty that two different IP addresses that are associated with the same GUID are associated with the same computer.

## Summary of Investigation to Date

20. Beginning on June 17, 2019, and continuing through September 09, 2019, while utilizing Child Protective System (CPS) tools, your Affiant, identified a particular computer in Northwest Arkansas using IP address **72.204.3.240** that was making numerous files of suspected child pornography available for download on the eMule network. Using the CPS online tools, your Affiant directly connected to the device located at IP address **72.204.3.240** on multiple dates between June 17, 2019 and September 09, 2019. On each occasion, your Affiant successfully completed full and/or partial downloads of files that the device at IP address **72.204.3.240** was making available. Additionally, because IP address **72.204.3.240** was the sole candidate for the downloaded files, they were downloaded entirely and directly from the device located at IP address **72.204.3.240**.

21. The following is a brief description for a few of the files downloaded directly from the device located at IP address **72.204.3.240**:

**June 29, 2019 – FULL DOWNLOAD**

*FILE NAME: Felixxx_235952_ZRH_Felixxx_151251_uLk_PTHC-*

*6yo~16yoBlowjobbyCaligvla-(402).jpg*

*eD2k hash: 48A6DA615387ECB8DF78BC909CC1EAE1*

*In reviewing the picture file, your Affiant observed a prepubescent white female between the ages of 8-10 years old performing oral sex on a white male.*

**July 05, 2019 – FULL DOWNLOAD**

*FILE NAME: PTHC - Toddler Girl - Babysitting Tutorial - Extreme Diaper Change -*

*06m37s.avi*

*eD2k hash: 5D45D517317500211FF68E656B44FEE7*

*In reviewing the video file, which is 06:37 (MM:SS) in length, your Affiant observed a 2-3 year old toddler aged white female lying naked on a bed. At approximately 00:07 (MM:SS) in the video, an adult white male enters the picture and rubs his penis on the toddlers vagina. At approximately 01:18 (MM:SS) in the video, the toddler performs oral sex on the adult male and at 02:58 (MM:SS) the adult male performs oral sex on the toddler. For the duration of the video, the male masturbates while rubbing his penis against the toddler's vagina. At approximately 06:16 (MM:SS) the male ejaculates on the toddlers vagina and stomach.*

**July 07, 2019 – FULL DOWNLOAD**

*FILE NAME: Babygirl - Babies Toddlers - Cum And Crying (New Compilation Of Rare Baby Toddler 1Yo 2Yo Pthc Babyf\*\*\*[1] Vids).avi_snapshot (64).jpg*

*eD2k hash: B9C0BA517D05731CBB78FEFB8EFDDE4E*

*In reviewing the picture file, your Affiant observed a prepubescent white female between the ages of 8-10 years old lying on a bed that is covered with a multi-colored quilt. The female's hands are bound with a yellow colored rope and her arms are extended above her head. Each leg is also tied from the upper leg to the lower leg causing her knees to bend and her legs to spread. The focus of the camera is on the minor female's nude genitals.*

22. An Internet search of IP address **72.204.3.240** revealed that it was owned and serviced by Cox Communications. On July 09, 2019, your Affiant served Department of Homeland Security Summons ICE-HSI-FU-2019-00381 upon Cox Communications for subscriber information for IP address **72.204.3.240**. Cox Communications subsequently complied with the summons by providing the requested information. In reviewing the response from Cox Communications, your Affiant observed that IP address **72.204.3.240** was subscribed to by IVY MARCY (hereinafter referred to as MARCY) of 2100 Ashlee Dr., Apartment B, Springdale, Arkansas 72764 (**SUBJECT PREMISES**).

23. Your Affiant searched Washington County Property Assessment Records and confirmed that MARCY was the owner of a 2016 Toyota Scion, which was registered to the **SUBJECT PREMISES**. Washington County Property records also identified LANCE C. WELCH (hereinafter identified as WELCH) as a resident of the **SUBJECT PREMISES**; according to property records, WELCH showed to be the owner of a 2015 Toyota Corolla. Your

---

[1] Redacted for purposes of filing

Affiant searched water records for the **SUBJECT PREMISES** and identified WELCH as the current subscriber. Your Affiant also searched Facebook records and found public profile pages for WELCH and MARCY. MARCY posted that she and WELCH were married on January 26, 2019. Your Affiant obtained State of Arkansas driver's license records for WELCH and MARCY which matched their Facebook profile photos and also listed their address at the **SUBJECT PREMISES**. MARCY'S last name showed to be WELCH on her driver's license, which was issued February 01, 2019.

24. On August 22, 2019 at approximately 08:30 hours, your Affiant conducted mobile surveillance of the **SUBJECT PREMISES,** and in doing so, observed a blue Toyota Scion displaying Arkansas License plate 578RLI parked in the driveway. State of Arkansas records confirmed that this vehicle was registered to MARCY. Your Affiant checked for any open wi-fi connections in the area and was unable to find any.

## Conclusion

25. *Necessity of On-site and Off-site examinations of entire computers or storage media.* Based on my experience and the training and experience of other agents, many of the items sought in this Affidavit may be stored electronically. Based on my experience and consultation with computer forensic experts, I know that electronic files can be easily moved from computer or electronic storage medium to another computer or medium. Therefore, electronic files downloaded to or created on one computer can be copied on or transferred to any other computer or storage medium at the same location. In addition, based on my experience, I know, that while on-site examinations might provide basic evidence of the alleged crime, the execution of most warrants involving computerized information requires special agents to seize a portion or all of a computer system's central processing unit (CPU), input/output peripheral

devices, related software, documentation, and data security devices, including passwords, so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

(a) Volume of evidence and time required for examination: Computer storage devices such as hard disks, diskettes, tapes and laser disks, can store the equivalent of thousands of pages of information. This sorting process can take up to several months to complete, depending on the volume of data stored. Therefore, in most cases, reviewing that information for items described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt solely via an on-site examination.

(b) Technical requirements: Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a variety of forensic tools. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional destruction (both from external sources and from destructive code embedded in the system such as a "booby trap"), a controlled environment, in most instances, is essential to a complete analysis.

26.     Therefore, authorization is sought in this application to seize, image, or otherwise copy any and all digital media as set forth in Attachment "B" that is found on the premises to be searched, in order to examine those items for evidence. Furthermore, authorization is sought

herein to conduct both on-site and subsequent off-site examinations of the electronic evidence as authorized by Rule 41(e)(2) of the Federal Rules of Criminal Procedure. If it is determined that data has been seized that does not constitute evidence of the crimes detailed herein, the government will return said data within a reasonable time.

27.     Based on my experience and the training and experience of other agents involved with this investigation, your Affiant knows that individuals involved in the sexual exploitation of children through child pornography almost always keep copies of their sexually explicit material. Among the reason's copies are maintained is because child pornography is illegal to openly purchase, and the most common method of acquiring it is by trading with other people with similar interests. It is also known that due to the inherent illegality of these sexually explicit materials, they are most often kept in a place considered secure, usually a residence, to avoid detection by law enforcement. Because several people can share the **SUBJECT PREMISES** as a residence, it is possible that the **SUBJECT PREMISES** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

28.     Based on the foregoing information, probable cause exists to believe there is located at 2100 Ashlee Dr., Apartment B, Springdale, Arkansas 72764, the **SUBJECT PREMISES**, evidence of violations of Title 18, United States Code, Section 2252, et seq. Your Affiant prays upon his honorable court to issue a search warrant for the **SUBJECT PREMISES** for the items set forth in Attachment "B" (which is attached hereto and incorporated herein by

reference), that constitute evidence, fruits, and instrumentalities of violation of Title 18, United

States Code, Section 2252, et seq.

Thomas W. Wooten, Detective/Task Force Officer
Homeland Security Investigations

AFFIDAVIT subscribed and sworn to before me this ____ day of September 2019.

Honorable Erin L. Wiedemann
Chief United States Magistrate Judge